IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| ARTHUR GREEN, <br><br> Plaintiff, <br><br> v. <br><br> CENTRAL MIDLANDS REGIONAL TRANSIT AUTHORITY, D/B/A THE COMET, <br><br> Defendant. | C/A No. 3:17-cv-02667-CMC <br><br><br> Opinion and Order <br> on Motion for Summary Judgment <br> (ECF No. 46) |

Through this action, Arthur Green ("Green") seeks recovery from the Central Midlands Regional Transit Authority, d/b/a The Comet ("CMRTA") for alleged discrimination in violation of the Americans with Disabilities Act of 1990, 49 U.S.C. § 12111 *et seq.* ("ADA"). Green alleges CMRTA violated Title II of the ADA, 49 U.S.C. § 12131 *et seq.* ("Title II"), which prohibits discrimination in the provision of public services, by failing to provide non-discriminatory service on buses operated by or on behalf of CMRTA.[1]

**STANDARD**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The

---

[1] The services at issue were provided by Transdev Services, Inc. ("Transdev"), a private company contracted by CMRTA to provide bus service in the relevant area. For purposes of this order, the court does not distinguish between CMRTA and Transdev.

party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## BACKGROUND

**Allegations.**[2] Green is a paraplegic confined to a wheelchair. ECF No. 1 (Complaint) ¶¶ 2, 9. For purposes of its summary judgment motion, CMRTA does not dispute Green is a qualified individual with a disability as required to establish the first element of a Title II claim. *See infra* Discussion § I ("Elements of Title II Claim").

During the twenty-seven month period at issue in this action, Green regularly used bus services provided by CMRTA as his primary means of transportation.[3] He was generally accompanied by his wife ("Mrs. Green"). *Id.* ¶ 11. On multiple occasions during this period, Green alleges he encountered difficulties utilizing CMRTA's bus services. *See* Complaint ¶¶ 12-39. The difficulties fall into three categories: (1) roughly twenty-seven instances in which the wheelchair lift or related mechanisms malfunctioned (*id.* ¶¶ 12-18, 22-31, 36, 37); (2) four instances in which a driver did not properly secure Green's wheelchair, at least initially (*id.* ¶¶ 32,

---

[2] The Complaint is unverified. The court, nonetheless, cites to the Complaint in setting forth background allegations.

[3] The Complaint alleges Green suffered a personal injury as a result of an incident on February 28, 2015. Complaint ¶ 10. However, Green does not seek relief for this incident in this action. Complaint ¶ 10; ECF No. 52 at 2 n.2 (noting the February 28, 2015 incident is "the subject of a separate lawsuit"); Green dep. at 16. The remaining allegations relate to the twenty-seven month period from May 2015 through August 2017.

2

33, 36, 39); and (3) roughly nine instances in which a driver was discourteous or treated Green less favorably than other passengers (*id.* ¶¶ 17, 19-21, 34-36, 38).

**Lift Malfunction Allegations.** The alleged difficulties with the wheelchair lift and related mechanisms fall into two subcategories: (1) instances in which the malfunction precluded Green from boarding; and (2) instances in which the malfunction occurred while Green was boarding or attempting to disembark. The first subcategory resulted in denial of service on the bus with the malfunctioning lift, requiring Green to wait for another bus or relocate to another bus stop in order to obtain service. *Id.* ¶¶ 12, 13, 15, 17, 27, 28, 30, 31, 36, 37; *see also id.* ¶ 16.[4] Green alleges that on one occasion in August 2016, four buses in a row had inoperable wheelchair lifts. *Id.* ¶ 27. Green's other allegations involve a single bus with a malfunctioning lift, though he alleges two series of incidents in May and June 2015, when he encountered similar problems over succesive days. *Id.* ¶¶ 12, 13, 15, 16.

The second subcategory caused Green to suffer inconvenience and delay and, in some cases, fear and anxiety. *Id.* ¶¶ 14, 18, 23-26. In one instance, Green alleges he was stranded on the lift in the air for nearly two hours, causing him to suffer substantial fear and anxiety. *Id.* ¶ 14. In another instance, he alleges he was stuck on the bus for an hour after other passengers disembarked. *Id.* ¶ 26. Other instances involved shorter delays. *E.g.*, *id.* ¶ 18 (alleging delay of

---

[4] The allegations in paragraph sixteen are too vague to categorize. *Id.* ¶ 16. However, Green's deposition testimony suggests the alleged malfunction resulted in a denial of service on the bus with the malfunctioning lift. Green dep. at 59-61 (initially indicating he did not recall anything about this incident other than what was in the Complaint but then stating he was able to catch another bus, suggesting the difficulty resulted in denial of service on the first bus).

3

a few minutes while driver lowered the lift manually); *id.* ¶ 23 (alleging he suffered momentary fear when a lift lowered unexpectedly before driver stopped it).

**Green Deposition.** During his deposition, Green was questioned about the various instances in which he encountered difficulties due to lift malfunctions. *E.g.* Green dep. at 18-25, 28, 35, 38, 41-49.[5] Green had limited recollection of some incidents.[6] While the Complaint alleges and Green testified Mrs. Green took notes and sent texts or otherwise communicated complaints to CMRTA regarding many of the incidents, he has not proffered a prediction of admissible evidence regarding Mrs. Green's observations or complaints. *See* Complaint ¶ 11; Green dep. at 24, 25.[7]

Addressing the first incident in which a malfunction prevented him from boarding, Green testified the driver apologized for the inconvenience and called his supervisor who agreed to send other transportation. Green dep. at 18-22, 24 (stating, in addressing Complaint ¶ 12, that driver

---

[5] The parties have filed only selected pages of Green's deposition. *See* ECF No. 46-7 (CMRTA's submission of 73 pages plus one exhibit); ECF No. 52-1 (Green's submission of 11 pages).

[6] *See, e.g., id.* at 35 (addressing Complaint ¶ 13); *id.* at 59-60 (addressing Complaint ¶ 16); *id.* at 69 (addressing Complaint ¶ 17); *id.* at 103-04 (addressing Complaint ¶ 25); *id.* at 113, 130, 131, 160 (addressing Complaint ¶¶ 28, 30, 31, 36).

[7] Green proffers printouts of documents that purport to represent Mrs. Green's notes, texts and photographs. *See* ECF No. 52-2, 52-3, 52-4, 52-5; *see also* ECF No. 52 at 2, 8 n.6 (citing these exhibits in opposition memorandum). He does not, however, proffer deposition testimony, an affidavit, or other evidence that might resolve hearsay concerns with the out-of-court statements. There is no evidence CMRTA actually received any of the claimed text messages, and substantial evidence it did not. *See* ECF No. 46-10 (declaration of CMRTA employee explaining number to which Green claims texts were sent "is not capable of receiving text messages"); ECF No. 52 at 2 n.3 (Green's memorandum conceding there "is some issue as to whether Defendant was able to receive these complaints at the number they were sent to."). Thus, many of the documents on which Green relies in opposing summary judgment are not a prediction of admissible evidence.

4

"felt real bad"). Rather than waiting on alternate transportation, Green elected to use his motorized wheelchair to travel five blocks to another bus stop. *Id.* at 20, 21 (stating he does not recall how long it took to travel the five blocks).[8]

Green did not recall the precise wait time for the next bus when the malfunction on one bus required him to wait for another. *See infra* Discussion § II.A. (addressing, inter alia, 49 C.F.R. § 37.163(f), which requires alternate service be provided if the next bus is not scheduled to arrive within thirty minutes). At one point, he testified the next bus usually came within thirty to forty minutes. Green dep. at 38. At several other points, he testified either that the next bus generally arrived within thirty minutes or after a short wait. *Id.* at 60 (stating buses generally came "[w]ithin a half an hour"); *id*. at 69 (stating, in addressing allegation he was "stranded for an unacceptable length of time," that he caught another bus in "about half an hour"); *id.* at 52-56 (stating he was able to take a different bus after a short wait by moving to a different stop less than two blocks away); *see also* ECF No. 47 at 13 (chart summarizing Green's testimony regarding wait times for the next bus or alternate service).

Green testified to one instance in which he waited more than thirty minutes for alternate transportation after encountering a bus with a malfunctioning lift. Green dep. at 111 (addressing Complaint ¶ 27). This is the incident in which Green encountered four buses in a row with lift problems. *Id.* Green testified he had to wait forty-five minutes before he was able to board a bus with a functioning lift. *Id*. He also testified a supervisor "stayed through the whole time" and tried to fix the problem on each of the buses with malfunctioning lifts. *Id.* at 110.

---

[8] The Complaint alleges "[t]he driver made no attempt to try to alert a bus to come and pick Plaintiff up[.]" Complaint ¶ 12.

As to instances when a lift malfunctioned while he was boarding or when he tried to disembark, Green testified the problems required action by the driver, a supervisor, a mechanic, or a combination of personnel.[9] The most extreme delay in resolving such a malfunction occurred on May 30, 2015, and left Plaintiff stranded on the lift for nearly two hours. Green dep. at 41-49 (addressing Complaint ¶ 14). Both a supervisor and maintenance worker were called and attempted to resolve the problem. *Id.* at 43, 45. When the supervisor and mechanic could not fix the lift, they used a lift on a truck to remove Green from the bus. *Id.* at 45. Green was afraid he would fall during the time he was on the lift and believes the experience caused him to have elevated blood pressure when he visited his doctor the following day. *Id.* at 43, 45, 49.

In one other instance, Green testified he was stranded on the bus (not the lift) for one hour after other passengers disembarked. *Id.* at 105 (addressing Complaint ¶ 26). A mechanic was called to resolve this problem after the driver and supervisor were unable to do so. *Id.* One other instance left Green stuck on a lift for fifteen minutes and was resolved by a supervisor using the manual function to deploy the lift ("Manual Function"). *Id.* at 96-99 (addressing Complaint ¶ 24). In other instances, lift problems either involved momentary slipping or malfunctions were resolved in a short time by the driver. *E.g.*, *id.* at 70-72 (addressing Complaint ¶ 18); *id.* at 92-96 (addressing Complaint ¶ 23).

As to each incident involving a lift malfunction, Green testified he was not aware whether the lift was repaired or the bus was taken out of service before the following business day. *See*,

---

[9] *See, e.g., id*. at 41-49 (addressing Complaint ¶ 14); *id.* at 70-72 (addressing Complaint ¶ 18,); *id.* at 92-96 (addressing Complaint ¶ 23); *id.* at 96-99 (addressing Complaint ¶ 24); *id.* at 105 (addressing Complaint ¶ 26).

*e.g.*, ECF No. 47 at 9-11 (chart summarizing Green's testimony); *see also infra* Discussion § II.A. (addressing regulations relating to actions required after a malfunction). Green proffers no other evidence regarding how lifts were maintained and whether CMRTA complied with related regulations.[10]

The last alleged incident involving a lift malfunction occurred on March 30, 2017, six months before this action was filed. Complaint ¶ 37. On January 17, 2019, Green testified he no longer encounters difficulties boarding or disembarking buses because of a change in the buses. Green dep. at 181-82 (testifying new buses are a "whole lot better"). CMRTA also proffered evidence the problems were resolved by replacing the buses with buses that use a different type of lift. ECF No. 46-9 at 10 (Nicholson dep. at 22).

**Failure to Properly Secure Wheelchair Allegations.** The Complaint alleges four instances in which Green's wheelchair was not properly secured or a driver acted discourteously in the process of securing the wheelchair. Complaint ¶¶ 32, 33, 36, 39. The first incident allegedly occurred on September 23, 2016, and involved a driver securing only two of four straps. Complaint ¶ 32. Green alleges he drew the error to the attention of a supervisor who attached the remaining straps. *Id.* The next incident allegedly occurred on September 30, 2016, and again involved a driver attaching only two of four straps. *Id.* ¶ 33 (alleging driver refused to secure

---

[10] Green challenges CMRTA's reliance on certain maintenance records because they were not produced in discovery. ECF No. 52 at 4, 5 (addressing maintenance protocol and records filed as ECF Nos. 46-3 and 46-6). He proffers CMRTA's responses to interrogatories seeking a list of all documents in CMRTA's possession that "relate to the claim or defense in the case" or "are relevant to the Complaint or Answer." ECF No. 52-6 at 4 (interrogatories 2, 3). CMRTA responded by producing documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. *Id.* Green maintains CMRTA should have disclosed the challenged records in this or a supplemental response but did not do so. The court agrees the challenged maintenance records should be excluded.

7

additional straps after Green drew the error to his attention). While these alleged incidents may have been addressed in Green's deposition, neither side proffers deposition pages addressing them.[11]

The third incident allegedly occurred on March 15, 2017. *Id.* ¶ 36. Rather than alleging a failure to attach all four straps, Green alleges the straps came loose when the driver slammed on brakes. *Id.* Instead of checking the straps, the driver said they would not tighten and took no further action. *Id.* In his deposition, Green testified he believed the straps came loose because his chair moved. Green dep. at 157-60.

As to the fourth incident, Green alleges the driver acted "very rudely" when Green and his wife tried to politely assist her. Complaint ¶ 39 (addressing incident on August 30, 2017). He does not allege the straps were not properly secured. Neither side proffers deposition testimony relating to this incident.[12]

**Discourteous Behavior, Allegations and Evidence.** The Complaint identifies nine instances in which a bus driver allegedly treated Green or his wife discourteously. Complaint ¶¶ 17, 19-21, 34, 35, 38. Five of these instances allegedly resulted in a denial of service. *Id.* ¶¶ 17, 19, 20, 21, 34.

The first incident allegedly occurred on July 10, 2015, and involved a bus driver stating the bus was full, even though it appeared to Green that no disabled or elderly individuals were

---

[11] A question relating to the first incident is included in the deposition excerpts submitted by CMRTA. Green dep. at 131. Pages covering Green's response and any subsequent discussion are not provided by either party.

[12] Annotations on photographs purportedly taken by Mrs. Green state the driver initially attached the straps to the wrong points but ultimately attached them properly. ECF No. 52-9 at 3.

8

seated in the areas reserved for a wheelchair. *Id.* ¶ 17. Green testified there were lots of people in the bus but the passengers in the wheelchair seats did not appear to be elderly or handicapped. Green dep. at 63, 64. As to this incident, Green testified the driver could have asked someone to move "[b]ut evidently, he didn't" do so. *Id.*[13]

The second alleged incident occurred on March 30, 2016, when the driver rolled past the proper pick up point, preventing the lift from opening properly, and refused to back up, stating she could not do so and Green would have to wait for the next bus. Complaint ¶ 19. As to the next four incidents, Green alleges the following: (1) Green was denied service on the same bus and on the same route the next day (following March 30, 2016); (2) Green was denied service after his wife and a driver had a dispute over whether the Greens were at the proper stop; (3) a bus driver boarded after non-disabled passengers boarded, looked at Green, then drove off without allowing Green to board; and (4) a driver allowed other passengers to board or disembark before Green three times in the same day (February 22, 2017). *Id.* ¶¶ 20, 21, 34, 35.

In his last allegation of discourteous behavior, Green alleges that, on April 10, 2017, a driver required him to wait while five or six other passengers boarded first. *Id.* ¶ 38 (alleging it was the third instance of mistreatment by the same driver). In his deposition, Green testified he asked the driver why she did this and she said she wanted to let the others board first. Green dep. at 168-69 (stating he was delayed for 15 minutes waiting for 15 passengers to board ahead of him).

---

[13] Photographs proffered by Green show this bus number and include a notation with the date of this incident. *See* ECF No. 52-3 at 4, 5. However, the problem described in the annotation relates to a "broken lift." *Id.* Thus, this document does not support the allegation of discourteous behavior alleged in the Complaint.

# DISCUSSION

## I. Elements of Title II Claim

Title II applies to "public entities," which includes "any department, agency, special purpose district or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(B). CMRTA concedes it is "an instrumentality of several local governments" and, consequently, subject to the requirements of Title II. ECF No. 47 at 7.

To establish a claim under Title II, Green must prove three elements: (1) he is a qualified individual with a disability; (2) he was discriminated against by being excluded from or denied the benefits of a public entity's services; and (3) the discrimination was because of his disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). For purposes of summary judgment, CMRTA concedes Green satisfies the first element but maintains he has not proffered admissible evidence of the second and third elements.

## II. Lift Malfunction and Driver-Related Allegations

**A.  CMRTA Arguments.**  As to allegations involving lift malfunctions, CMRTA relies on regulations that recognize malfunctions may occur and specify the actions the service provider must take in the event of a malfunction. It argues as follows:

> The ADA's implementing regulations require public entities to maintain the lifts in "operative condition," but further contemplate that—as common sense makes clear—sometimes, mechanical things break. *See* 49 C.F.R. § 37.161(a)-(c) (stating lifts must be maintained in operative condition, but that "isolated or temporary interruptions in service or access due to maintenance or repairs" are not prohibited). If the lifts do not function, then the transportation entity needs to repair the lifts "promptly." *Id.* § 37.161(a). The entity may take the bus with the inoperable lift out of service immediately, but it may also keep the lift in service for the remainder of the service day. *See id.* § 37.163(a), (d), (e) (stating that when a lift is discovered to be inoperative, it must be taken out of service "before the beginning of the vehicle's next service day" and that under certain, specified circumstances, the vehicle may remain in service for three days); *see also Midgett v. Tri-County Metro. Transp. Dist.*, 74 F. Supp. 2d 1008, 1018 (D. Or. 1999) (refusing to grant

preliminary injunction re wheelchair lifts because "when viewed in the larger context of Tri–Met's entire fixed route system and the diverse passengers, including diverse disabled passengers, that it serves, I am compelled to conclude that the ongoing occasional lift problems do not violate the ADA or its implementing regulations").

ECF No. 47 at 8.

CMRTA argues Green has not proffered evidence of any instance in which it failed to either repair the lift or take a bus out of service before the following day as required by 49 C.F.R. § 37.161(a)-(e) (relying, in part, on Green's deposition testimony regarding his lack of knowledge of maintenance). *Id.* at 8-11. Neither, it submits, has Green shown CMRTA failed to offer him alternate service, as required by 49 C.F.R. § 37.163(f), when the next bus on the same route was more than thirty minutes away. *Id.* at 12.[14]

Even if Green could establish a Title II violation relating to a lift malfunction, CMRTA argues he has not proffered evidence or argument that would support any relief. *Id.* at 18-21. It argues he cannot obtain injunctive relief because the problems with lift malfunctions were resolved by replacing the buses, mooting any claim for injunctive relief. *Id.* at 21, 22. To the extent Green seeks monetary relief, CMRTA argues his claim is precluded because he cannot establish the requisite motivation. *Id.* at 18-21 (arguing Green cannot establish deliberate indifference, the lower of two potentially applicable standards for proving "intentional discrimination," a prerequisite for recovery of damages).[15]

---

[14] CMRTA also suggests the possibility the combined weight of Green and his wheelchair could have caused the lifts to malfunction. The court does not consider this argument here and, consequently, does not address Green's counterargument.

[15] CMRTA concedes the Fourth Circuit has not ruled on the applicable standard and the three circuits that have decided the issue have adopted a deliberate indifference standard. ECF No. 47

CMRTA characterizes Green's other allegations (*e.g.*, that drivers failed to properly secure his wheelchair, acted discourteously, or treated Green less favorably than other passengers) as challenging the adequacy of CMRTA's training. It argues Green cannot establish such a claim because he has neither adduced evidence of CMRTA's training program and practices nor suggested any way in which the training should be improved. ECF No. 47 at 5, 6.

B.  **Green's Arguments**

Green acknowledges the regulation on which CMRTA relies (49 C.F.R. § 37.163) may provide a safe harbor in some circumstances, but argues the safe harbor is available only for malfunctions that are "isolated or temporary." ECF No. 52 at 7 (relying on 49 C.F.R. § 37.161(c)).[16] He maintains the frequency of the problems he encountered, combined with the drivers' actions and inactions (including but not limited to their failure to allow boarding using the Manual Function) raise a genuine issue of material fact that precludes summary judgment on the merits of his claim. *Id.* at 9, 10.[17]

---

at 18-19 (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001) as collecting cases and adopting and defining the deliberate indifference standard).

[16] In its reply, CMRTA argues Green improperly conflates the provisions of 49 C.F.R. § 37.161, which uses the "isolated and temporary" language in acknowledging malfunctions will occur, with those of 49 C.F.R. § 37.163, which describes what actions must be taken to minimize and address malfunctions.

[17] In support of this position, Green relies on the testimony of Mark Nicholson, CMRTA's Rule 30(b)(6) witness. In the proffered pages of his deposition, Nicholson testified the bus lifts could be operated both using a "hydraulic over electric" function and the Manual Function. The latter operated like a floor jack. Nicholson dep. at 24, 25. Nicholson answered "no" when asked if he had "any knowledge of a situation with a lift . . . wherein both the hydraulic over electric malfunctioned as well as the manual way to rise [sic] or lower [the] lift" malfunctioned. *Id.* at 25.

As to CMRTA's alternative argument that Green cannot establish a right to relief even if he establishes a Title II violation, Green argues he need only prove deliberate indifference to establish entitlement to damages. ECF No. 52 at 11. He maintains he has proffered sufficient evidence to satisfy this standard because he has shown a "notable and repeated pattern of interruption" of service due to lift malfunctions, including failure to use the Manual Function to allow boarding when the electric over hydraulic system failed. *Id.*at 11, 12. He asserts these failures "forced [him] to wait extended periods, travel extended distances in his wheel chair, or risk missing appointment[s]." *Id.* at 12. He concludes CMRTA's "failure to take control of its repeated malfunctions in a proper manner, and in instances of a malfunction properly utilize the [Manual Function] to provide services to Plaintiff constitutes deliberate indifference[.]" *Id.*

In the alternative, Green argues he is "entitled to declaratory and injunctive relief, costs, and attorney's fees." *Id.* at 12. He does not address this argument further, for example by specifying the declaratory or injunctive relief sought. Neither does he address the impact of changed circumstances (new buses with a different lift system) on any claim for injunctive or declaratory relief.

**C. Discussion**

**Violation of Title II.** CMRTA's argument interprets 49 C.F.R. § 37.163 to provide a safe harbor regardless of the frequency of lift malfunction, so long as the service provider addresses each malfunction by taking the actions specified in that regulation.[18] In contrast, based on

---

[18] Section 37.163 specifically addresses "vehicle lifts" and requires service providers to do all of the following: (1) "establish a system of regular and frequent maintenance checks" (§ 37.163(b)); (2) ensure operators report failures by "the most immediate means available" (§ 37.163(c)); (3) when a malfunction is discovered, remove vehicles "from service before the beginning of the

language in 49 C.F.R. § 37.161, Green argues any safe harbor is available only if the malfunctions are isolated and temporary.[19]

At least one court has read the regulations as Green suggests. *Tandy v. City of Wichita*, 208 F. Supp. 2d 1214 (D. Kan.), *reversed, in part, on other grounds*, 380 F.3d 1277. 1291 (10th Cir. 2004) (addressing standing and mootness). There the court held that, while "isolated lift failures do not constitute an ADA violation[,] . . . a pattern of lift breakdowns can constitute a violation." *Id.* at 1225. Based on this interpretation, the court denied summary judgment where plaintiffs had presented a triable issue "that the rate of mechanical failures within the [challenged] system is unusual given the number of buses so as to constitute a pattern of breakdowns as opposed to isolated incidents within a statistical median range." *Id.* at 1225.[20]

Green alleges a total of twenty-seven malfunctions over the same number of months, with roughly eighteen of those malfunctions resulting in a denial of service because the lift was

---

vehicle's next service day and ensure that the lift is repaired before the vehicle returns to service" (§ 37.163(d) (subject to exceptions in § 37.163(e)); and (4) "In any case in which a vehicle is operating on a fixed route with an inoperative lift, and the headway to the next accessible vehicle on the route exceeds 30 minutes, the entity shall promptly provide alternative transportation to individuals with disabilities who are unable to use the vehicle because its lift does not work" (§ 37.163(f)).

[19] Section 37.163 requires service providers "maintain in operative condition those features of . . . vehicles that are required to make the vehicles . . . readily accessible to and usable by individuals with disabilities," but "does not prohibit *isolated or temporary* interruptions in service or access due to maintenance or repairs." 49 C.F.R. § 37.161(a), (c) (emphasis added).

[20] *Tandy* addressed Title II claims asserted by multiple plaintiffs with a variety of disabilities. The discussion of lift malfunctions related to claims of plaintiffs who sought injunctive relief requiring the bus service to "maintain its vehicles so that they will be readily accessible to and usable by individuals with disabilities." *Id.* at 1224.

inoperable when he sought to board. Green points to evidence the drivers could have used the Manual Function to allow boarding in these instances but did not do so.[21] A number of instances involving malfunctions after boarding left him stranded on the bus or lift, with two instances stranding Green for an hour or more. In addition, Green points to a number of instances in which drivers treated him less favorably than other passengers, including by requiring Green to wait for others to board, even though he was first in the line, or acted discourteously (or ineffectively) in securing Green's wheelchair. Drawing all inferences in Green's favor, the court finds the collective allegations and evidence sufficient to raise a genuine issue of material fact as to the merits of Green's Title II claim.

**Injunctive Relief.** Green cannot obtain injunctive relief regarding the lift malfunctions or driver's related failure to use the Manual Function because he has failed to allege or proffer evidence the problems are continuing or likely to occur again. He, in fact, testified that he no longer encounters problems with the lifts. Green dep. at 181-82. This concession is consistent with uncontroverted testimony from CMRTA's Rule 30(b)(6) witness that most of the buses with the type lift at issue have been replaced and those that remain are not in regular use. Nicholson dep. at 22, 23. Similarly, Green offers no allegations or evidence of ongoing problems involving

---

[21] Green relies on Nicholson's testimony the Manual Function operated like a floor jack and negative response to a query whether Nicholson was aware of any instance in which both the hydraulic over electric and Manual Function allowing the operator "to rise and lower the lift" failed. Nicholson dep. at 25. This is sufficient to raise an inference the Manual Function could have been used.

15

driver discourtesy, failure to properly secure his wheelchair, or other actions or inactions that may violate Title II.[22]

Green's failure to allege ongoing Title II violations is consistent with his failure to expressly seek injunctive or declaratory relief through his Complaint which, at most, includes a catch all request for "any such further relief as the Court deems just and proper." Complaint at 12. Even now, Green fails to specify any form of injunctive or declaratory relief that might address the alleged violations. His only reference to such relief is in the following conclusory sentence in his memorandum: "As set forth, Plaintiff remains entitled to declaratory and injunctive relief, costs, and attorney's fees." ECF No. 52 at 12.

In sum, Green neither expressly sought injunctive or declaratory relief through his Complaint nor, at this late stage, identifies any ongoing difficulties or equitable relief that might address such difficulties. He, instead, concedes problems with the lifts have been resolved, a point supported by undisputed evidence changes in equipment have eliminated the risk of the type malfunction addressed in this action. Under these circumstances, CMRTA is entitled to summary judgment to the extent Green's Complaint may be read to seek injunctive or declaratory relief. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004) (holding voluntary compliance may moot a claim for injunctive relief where defendant meets heavy burden of "demonstrating it

---

[22] The last lift malfunctions alleged in Green's Complaint occurred in March 2017. Complaint ¶ 36, 37 (filed early October 3, 2017). The last alleged incident involving driver discourtesy occurred in April 2017. Complaint ¶ 38. The last alleged failure to properly secure straps or related driver discourtesy occurred in August 2017. Complaint ¶ 39. Neither party has proffered evidence of any alleged Title II violations after August 2017.

is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." (internal marks omitted)).[23]

**Damages.** This leaves a possible claim for damages. Green argues the deliberate indifference standard governs his claim for damages. ECF No. 52 at 11-12. CMRTA maintains the more strenuous "discriminatory animus" standard should apply, but argues Green's claim fails even under the deliberate indifference standard. ECF No. 47 at 18, 19. CMRTA cites no case that has applied or defined its preferred standard and concedes the majority of courts that have decided the issue apply the deliberate indifference standard.[24]

The court's research confirms the vast majority, if not all, of the circuit courts that have decided the issue apply the deliberate indifference standard to claims for damages under Title II of the ADA or similar claims under the Rehabilitation Act. *See Havens v. Colorado Department*

---

[23] In *Tandy*, the appellate court found challenges to a policy that allowed drivers discretion to deny service was mooted by several changes of circumstance including modification of the equipment, routes, and policies allowing driver discretion. *Id.* (directing district court to consider, on remand, whether remaining claims for injunctive relief were moot).

[24] CMRTA notes the "standard for obtaining compensatory damages . . . has not been conclusively decided in the Fourth Circuit," and concedes "[t]he Second, Ninth and Tenth Circuits have adopted the deliberate indifference standard" and "[t]he Fifth Circuit has yet to decide the issue[.]" ECF No. 47 at 18, 19 (also noting a district court decision within the Fourth Circuit, *Charlotte-Mecklenburg Bd. of Educ. v. B.H.*, 2008 WL 4394191 (W.D.N.C. Sept. 24, 2008), has applied the deliberate indifference standard without discussing the basis for selecting that standard). While CMRTA argues the arguably higher "discriminatory animus" standard better aligns with the requirement to prove intentional discrimination, it points to no case that has applied that standard. *Id.* (citing *Alexander v. Sandoval,* 532 U.S. 275, 280-81 (2001) (stating plaintiff must prove "intentional discrimination" to recover under Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U.S.C. § 2000d et seq., a section arguably comparable to Title II). Neither does CMRTA explain what the "discriminatory animus" test requires. *Id.*; *see also* ECF No. 53 at 9 (arguing, in reply, "[t]he debate concerning the appropriate standard is drawn directly from the applicable statute as well as cases discussing Title II of the ADA," but citing no specific case other than *Duvall*, which applied a deliberate indifference standard).

*of Corrections*, 897 F.3d 1250, 1263, 1264 (10th Cir. 2018) (applying deliberate indifference standard to claim for damages under Rehabilitation Act); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir. 2012) (same) ; *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (same); *Meagley v. City of Little Rock*, 639 F.3d 384, 390 (8th Cir. 2011) (noting that "[e]very circuit court to address the issue since [2002] has reaffirmed that intentional discrimination must be shown to recover compensatory damages" under the Rehabilitation Act and ADA and applying deliberate indifference standard to proof of intentional discrimination). This court joins that majority.

The Ninth Circuit defines deliberate indifference as requiring "both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall*, 260 F.3d at 1139.[25] Green argues his evidence of "a notable and repeated pattern of interruption" of service that "forced [him] to wait extended periods, travel extended distances in his wheelchair, or risk missing appointment[s]" raises a genuine issue of material fact as to both prongs of this test. ECF No. 52 at 11, 12.

Green points to multiple instances in which lifts malfunctioned and the driver was unable or unwilling to resolve the problem, including by using the Manual Function. In some cases, this left Green to wait for another bus. On at least one occasion, the same problem occurred on four buses in a row. In a number of instances, most critically instances in which Green was left stranded on the bus or lift, CMRTA had to send a supervisor, maintenance person, or both before the problem could be resolved, resulting in well over a thirty-minute delay. CMRTA ultimately

---

[25] Neither side disputes this is the proper test if the deliberate indifference standard applies.

resolved the lift and related problems by replacing its buses with buses using a different lift system, though it is an open question whether this action should and could have been taken at an earlier time. As to issues of driver discourtesy and failure to properly secure Green's wheelchair, the evidence suggests most of these incidents were not reported to CMRTA (though Green and his wife believed they had texted complaints to CMRTA). Nonetheless, an inference may be drawn that the drivers themselves acted with deliberate indifference in some or all of these instances. *See Duvall* at 1140-41 (holding "if Duvall's account of the timing and content of his requests for accommodation and defendants' reactions thereto are accurate, a trier of fact could conclude that defendants' decisions not to accommodate him were considered and deliberate" and county could be held "vicariously liable for the actions of [its] employees").

The proffered evidence neither requires nor forecloses a finding of deliberate indifference. The court, therefore, denies CMRTA's motion for summary judgment to the extent it seeks a determination Green cannot recover damages.

### III. Other Alleged Violations

CMRTA also argues Green's Title II claim should be dismissed to the extent it alleges (1) violation of the complaint procedures required by 49 C.F.R §§ 101-109, or (2) any violation b relating to the Dial-a-Ride Transit ("DART") program. ECF No. 47 at 16-18. Green concedes both arguments. ECF No 52 at 5 n.4 (stating "Plaintiff does not contest Defendant's arguments" on either issue). Given this concession, CMRTA is entitled to summary judgment to the extent the Complaint relies either on alleged violations of 49 C.F.R. §§ 101-109 or violations arising out of the DART program.

## CONCLUSION

For reasons set forth above, CMRTA's motion for summary judgment is granted in part and denied in part. The matter shall proceed to trial under the current scheduling order.

**IT IS SO ORDERED.**

                                                s/Cameron McGowan Currie
                                                CAMERON MCGOWAN CURRIE
                                                Senior United States District Judge

Columbia, South Carolina
April 22, 2019